620 So.2d 1172 (1992)
Jeanne Harwell SMITH and Jesse L. Smith
v.
STATE of Louisiana Through the DEPARTMENT OF PUBLIC SAFETY and State of Louisiana through the Department of Transportation and Development.
No. CA 91 0618.
Court of Appeal of Louisiana, First Circuit.
September 28, 1992.
Rehearing Denied February 22, 1993.
*1173 Paul Due, Baton Rouge, for plaintiffs.
Jonathan R. Schmidt, Hammond, for State Dept. of Public Safety.
Randall Cashio, Baton Rouge, for State/ DOTD.
Wayne Ray Chutz, Port Vincent, for Livingston Police Jury.
Christopher Matchett, Baton Rouge, for intervenor State.
*1174 Before WATKINS, SHORTESS, LANIER, CRAIN and GONZALES, JJ.
LANIER, Judge.
This action is a suit for damages in tort arising from an accident that occurred when a motorist drove her automobile on a flooded private road and struck a pothole. Suit was filed by Jeanne H. Smith and her husband, Jesse L. Smith, (the Smiths) against the State of Louisiana through the Department of Public Safety (DPS) and the Department of Transportation and Development (DOTD); DPS and DOTD answered and filed third party demands against the Livingston Parish Police Jury (Police Jury). The trial court dismissed DOTD and the Police Jury and rendered judgment in favor of Mrs. Smith against DPS for $215,949.60. DPS took this suspensive appeal.

FACTS
In 1975, the Buddy Ellis Road (Road) was a rural, gravel and dirt road located in Sections 10, 11 and 12, Township 7 South, Range 3 East, south of the Town of Walker in Livingston Parish, Louisiana. The Road runs in an east-west direction, and, in 1975, it connected Louisiana Highway 447, also referred to as the Walker South Road, (La. 447) on the east with Louisiana Highway 1026 on the west. The road traversed property privately owned by the Crown Zellerbach Corporation (Crown) and the Juban family.[1] Crown used the Road to conduct its timber harvesting (logging) operations in the area. This general area was relatively isolated in 1975. Only one family (Bobby Gill) lived in the area and it was located south of the Road about 0.8 of a mile from the eastern (La. 447) end.
In about 1975, DPS became interested in developing a place for demolition training (explosive range), a firearm range and a training facility. An isolated area was needed for the firearm and explosives training. Captain William T. Poe of the Louisiana State Police helped to develop this facility. Approximately 140 acres of land was acquired by DPS in three transactions. This land was located in Sections 2, 3, 10 and 11 of Township 7 South, Range 3 East. Through Poe's efforts, DPS obtained predial servitudes of passage to its properties over the Road from Crown and the Juban family.[2] The conventional servitude agreement between Crown and DPS was signed by Crown on October 17, 1975, and by DPS on October 21, 1975. This agreement provided, in pertinent part, as follows:
It is understood and agreed that the right of way herein granted shall be solely for the purpose of constructing and maintaining a private road for the use of the GRANTEE herein, his agents, employees, heirs and assigns, and that GRANTEE shall not do or allow to be done any acts or act which shall cause said right of way to become a public road without the prior written consent of GRANTOR.
GRANTEE hereby agrees to construct or improve and maintain this road at its own expense and further agrees that GRANTOR shall be allowed the free use of said road at any and all times as well as grant the right of use thereof to other parties.
. . . . .
It is distinctly understood that this instrument shall not be construed as a conveyance of title to any part of the land covered hereby, nor of the minerals therein or thereunder, and grants only the right of way and servitude as herein provided.
This servitude covered only 7,564.61 feet of the Road owned by Crown located in Sections 11 and 12 of Township 7 South, Range 3 East; it did not cover that portion of the Road that continued to the west past the entrance to the DPS property.
Thereafter, DPS proceeded to develop its facility. Crown periodically conducted logging operations in the area and used the *1175 Road. In 1980, a stock patrol facility was completed on the DPS property. Trooper Leroy Robison was assigned to the stock patrol facility from its inception until it was closed in April of 1988. Trooper Robison testified that DPS did not have any equipment to work the Road so he got the Police Jury and Crown to occasionally work the Road with their equipment. Howard P. Elliot, Jr., DPS's general counsel, testified that DPS tried to obtain budgeting (funding) for the maintenance of the Road but was unsuccessful. DPS asked DOTD for assistance, but DOTD declined to do so because the Road was a private road and not a part of the State highway system. DPS asked the Division of Administration (DOA) for assistance, but DOA declined to do so on the ground that one State budgetary unit could not give its funds to another.
In 1983, Mr. Daniel Haggard acquired property near the intersection of the Road and the Bobby Gill Road.[3] Mr. Haggard testified he was the first resident in the area after Bobby Gill. Mr. Haggard stated that his property was located on the north side of the Road opposite the Bobby Gill Road and was approximately 0.8 mile west of the intersection of the Road and La. 447. He stated that "some time in 1984" a bridge on the west end of the Road (over West Colyell Creek) became impassible, and, thereafter, the only ingress and egress to and from his property was over the Road to La. 447.[4] Mr. Haggard also testified that the condition of the Road started getting bad in 1984.
On October 19, 1984, Crown entered into an act of exchange with The Natchez Corporation (Natchez). In this conveyance, Crown transferred title to 808.26 acres of land in Livingston Parish, Louisiana, to Natchez in exchange for the conveyance by Natchez to Crown of 1,883.00 acres of land in East Baton Rouge Parish, Louisiana, and 59.00 acres of land in Copiah County, Mississippi. Six of the tracts of land conveyed by Crown to Natchez were in Sections 10, 11, 12, 15 and 22 of Township 7 South, Range 3 East. The tract (No. 19) in Section 11 contained 31.34 acres and was bounded on the west by the DPS property and bounded on the south, in part, by the Road. The property description does not give the ownership of the properties bounding this tract on the north and east, or on the south where the property was not bounded by the Road. This contract did not grant a servitude of passage to Natchez over the Road.
On October 23, 1984, Natchez sold the 31.34 acre tract (Tract No. 19) in Section 11 to James H. Brackin, Waunell Carter Brackin, Marshall W. Brackin and Jimmie Kathleen Wall Brackin (the Brackins). The same property description used in the Crown-Natchez sale was used in this sale. This contract did not grant a servitude of passage to the Brackins over the Road.
The Brackins developed this property into a subdivision called Ashley Heights, Third Filing. They apparently marketed the subdivision lots through Holden Real Estate. On December 11, 1985, the Brackins sold lots 6 and 7 of Ashley Heights, Third Filing to Jesse L. Smith, Sr. and Jeanne Harwell Smith.[5] This contract did not grant a servitude of passage to the Smiths over the Road. The Smith's lots fronted on Jennifer Lane. Jennifer Lane intersected the north side of the Road approximately 1 mile west of the Road-La. 447 intersection. The Jennifer Lane-Road intersection was approximately 0.2 mile west of the Road-Bobby Gill road intersection. The Smiths moved on the property to live in September of 1986. Thereafter, Mrs. Smith travelled on the Road an average of 2 or 3 times a week.
Daniel Haggard testified that in 1986, about 40 families lived in the area and used the Road for access. During 1986, the *1176 condition of the Road deteriorated. Rudolph Ratcliff, the Police Jury Parish Superintendent, testified that the Police Jury records for 1986 showed that the Police Jury graded the Road on January 13, 1986, and did drainage work on the Road on February 11, 1986, but no other work was done on the Road that year.
Edward J. Murphy, an attorney specializing in real estate, title examinations and abstracts, was qualified as an expert witness in abstracting and title examination and testified that in 1986, Cavenham Forest Industries, Inc. (Cavenham) acquired the ownership of the Road (and other properties) from Crown.[6] Mrs. Smith testified that during October of 1986, logging operations were commenced on property along the Road and these operations continued into December of 1986. Logging trucks used the Road during this time. During this time, DPS and the Police Jury received numerous complaints about the general condition of the Road from those who used it. The evidence shows, and the trial court correctly found, that DPS had knowledge of the general condition of the Road in December of 1986.
Prior to December 20, 1986, there were heavy rains in the area and portions of the Road were flooded. On Saturday, December 20, 1986, Mrs. Smith decided to drive her 1975 Chevrolet van to a grocery store on La. 447 to get some food for Christmas. She went south on Jennifer Lane, turned left onto the Road and headed east toward La. 447. After proceeding an undetermined distance down the road, Mrs. Smith attempted to go around a pothole, got too close to the roadside ditch and slid in the ditch. Daniel Haggard and another man came with a tractor and pulled her van out of the ditch.
Mrs. Smith decided to continue on her errand. In the vicinity of a red barn on the north side of the Road, she encountered a flooded portion of the Road that was approximately "¾ of a block long". This flooded area was estimated as either ½ or 2/3 of a mile from La. 447.[7] Mrs. Smith slowed down and started to cross the flooded roadway. She was unable to see beneath the surface of the water. The left front tire of her van went down into a pothole. This snapped her neck backward and forward and pain went through her neck. In her deposition given on July 27, 1990, Mrs. Smith stated she continued through the flooded area, travelled to La. 447, turned left on La. 447 and went to the grocery store. At trial in September of 1990, Mrs. Smith testified that "I don't remember where I went after I hit the pothole." After finishing her shopping, she returned home over the Road. The Road was still flooded so she drove closer to the roadside ditch to avoid hitting the same pothole again. When she got home she told her husband about the incident.
In her July 1990 deposition, Mrs. Smith gave the following pertinent testimony about her speed at the time of the accident:
Q Now, when you realized that you wereor right before you entered the flooded section of roadway, did you reduce your speed?
A Yes, sir. You would drown out if you didn't reduce your speed and you got there down [sic]. But cars were coming up and down that road. I had no reason to think that I could not get down that road. I had no reason to know I was in danger because people were coming, people were on going, people were going to work.
Q And to what did you slow your speed as you began entering and as you entered the flooded section of roadway?
A I would say that I probably lowered it maybe to 15 miles an hour, and I'm going to give you an approximate approximate, because when you go into an area where there's water on the road, if you would go fast, you would drown *1177 if you were in a car, you would drown the car out.
Q So you feel comfortable in saying
A I'm saying approximately.
Q But you definitely reduced your speed from 20?
A Yes, sir, because that was the worst flooded area of the road.
Q But youthe question would be but you definitely recall reducing your speed from 20 and you approximate that reduction of about 5 miles per hour?
A Yes.
. . . . .
And at the time you hit the pothole, are you certain that you could not have been traveling more than 15 miles an hour?
A I know that I reduced speed in order not to drown out. I reduced my speed. I hadI don't know if I'd even been doing 20 on that one section.
At the trial, Mrs. Smith gave the following pertinent testimony about her speed:
Q. Okay. About how fast were you going?
A. I was going slow to keep from drowning my van out because alot [sic] of people have drowned out and my van, if you are careful, it wouldn't drowned [sic] out, but like a small car couldn't make it through there.
Q. What wheel of your vehicle went into the pothole?
A. The front, left wheel, hit the pothole.
Q. What happened to you, physically?
A. It jarred me terribly. It was like that I hit a brick wall, I hit something down in that pothole, I don't know what, and it was like that [sic] I hit a solid brick wall and it jarred me back out of that pothole. At this time, I was trying to watch the road and get through there without drowning out, too.
Mrs. Smith testified she never actually saw the pothole she struck and the evidence does not show the pothole's dimensions. At her deposition, Mrs. Smith gave the following pertinent testimony about the nature of the pothole:
THE WITNESS: Okay. Before I forget it, what I'd like to tell you about that pothole is there's constant shifting sand in that area. The loggers never stopped logging after my accident. Potholes open, potholes close.
BY MR. CASHIO:
Q Okay.
A The sand, there's a lot of sand in that area, in this incline where the creek floods out. One day a pothole will be somewhere, the next day, it won't, if you can understand what I'm talking about.
. . . . .
Q Do you haveexcuse me, thedo youdid you yourself make an inspection of this pothole that you say you hit at any time, any time after you initially struck it?
A I'm going tothe next day, after my accident, one of the men who lives along the road who has ditching equipment came into the area and dug the ditch out and shoved the dirt back up on the side of the road. When he did this, the pothole was filled up because of the shifting sand in that area.
Q Who was the man?
A Mr. Daniel Haggard.
Q Where is
A He owns Ashley Heights Trailer Park.
Q He's the owner. Does he live at the Ashley Heights Trailer Park?
A Yes, sir.
Q Now, did you request Mr. Haggard to, what, clean the ditches?
A No, sir. He went down there and did that on his own, as far as I know. I do not know the details of it. I only know that I believe my husband saw him there the next day.
Q But did you see him there the next day?
A No, sir, because I didn't go down that road the next day.
Q Have you ever visualized the pothole that you say you hit? Have you ever actually seen it?

*1178 A No, sir, but I felt it.
. . . . .
Q Let's go back on.
Is it fair to say, ma'am, at least as far as you're concerned, as least as an individual, you've never seen the pothole that you said you hit on December 20, 1986?
A That is correct.
Q Now, do you know of anyone who may have seen this pothole afterat any time after you hit it?
A They would have to have had X-ray vision because there was no ditch work done along that road. There was no way for flood water to get out. The loggers were still working on the road. At this time, we hadn't lived there too long, and we were newcomers to Livingston Parish. And I lost my train of thought.
A pothole could be some place one day and not be there the next.
Q You've explained that to us before. Let me repeat my question.
MR. CABALLERO: Yes or no is a good answer to this one. Let him ask it again.
BY MR. CASHIO:
Q Are you aware of anyone who you believe saw the pothole that you hit at any time after your accident?
A Ino.
. . . . .
MR. CASHIO: Let me get a clarification. Isn't it correct that you told us earlier that you have never seen this particular pothole that you say you hit?
THE WITNESS: I had never seen it until that day that I went down that hill and I got down in it. There had not been any really deep, deep, potholes.
MR. CABALLERO: You never, ever saw it. You only felt it. That's what you told us. Are you changing that now? Did you ever, ever see that pothole?
THE WITNESS: I never saw the pothole. I'm not changing anything, but y'all have got me so confused.
The evidence shows that the collision between the left front wheel of Mrs. Smith's vehicle and the roadway of the Road did not deflate the tire but did cause some damage to the wheel. The Smiths continued to use the vehicle after the accident. They had a front end alignment done on the vehicle in February of 1987, and at that time they learned the wheel was out of balance. They continued to drive on the wheel until July of 1987, when they bought new tires for the vehicle. At that time, they learned the rim of the wheel was bent. Thereafter, they used the wheel as a spare.
On Monday, December 22, 1986, Mrs. Smith telephoned her physician, Dr. Alan Farries, about her neck. He prescribed some "pain pills and muscle relaxers" for her and made an appointment to see her on Friday, December 26, 1986. She remained in treatment from that time until the time of the trial.

NONJOINDER OF AN INDISPENSABLE PARTY

(Assignment of Error 4)
DPS contends the trial court erred in overruling its peremptory exception raising the objection of nonjoinder of an indispensable party. DPS argues that because Crown is the owner of the roadbed and benefitted economically from the subsequent residential development, it is an indispensable party to the suit.
An indispensable party is one whose interest in the subject matter of the litigation is so interrelated that a complete adjudication of the controversy cannot be made unless he is joined in the action. La.C.C.P. art. 641. Hatfield v. Bush, 540 So.2d 1178 (La.App. 1 Cir.1989). One of the several solidary obligors may be sued to enforce a solidary obligation, without the necessity of joining all others in the action. La.C.C.P. art. 643 provides as follows:
All joint obligees are necessary parties to an action to enforce a joint right, and all joint obligors are necessary parties to an action to enforce a joint obligation.
One or more solidary obligees may sue to enforce a solidary right, and one or *1179 more solidary obligors may be sued to enforce a solidary obligation, without the necessity of joining all others in the action. (Emphasis added)
Official Revision Comment (b) to La.C.C.P. art. 643 provides the following:
(b) ... All solidary obligees are not necessary parties to an action to enforce a solidary right, and all solidary obligors are not necessary parties to an action to enforce a solidary obligation. One or more may sue or be sued; and those not joined are not necessary parties. See Breedlove v. Nicolet, [32 U.S.] 7 Pet. 413, 8 L.Ed. 731 (1833).
This is a suit in tort; it is not a suit to establish the rights of ownership, possession or use of the Road. The issue of the ownership and/or right of use or possession of the Road are collateral to the issue of tort liability. Joint tortfeasors are solidary obligors, and a plaintiff may sue any one, or more, of them.[8]Landry v. State Farm Fire & Casualty Co., 504 So.2d 171 (La.App. 3 Cir.1987); Inabinet v. State Farm Automobile Insurance Co., 262 So.2d 920 (La.App. 1st Cir.1972).
Smith had the right to seek judgment only against DPS; a complete adjudication of the controversy vis-a-vis Smith and DPS can be made without the joinder of Crown. As hereinafter discussed, even though Crown (or Cavenham) is not a party defendant, any fault attributable to it can be allocated herein. La.C.C. art. 2324; La. C.C.P. art. 1812; Haney v. Francewar, 588 So.2d 1172 (La.App. 1st Cir.1991); Perez v. State, Department of Transportation and Development, 578 So.2d 1199 (La.App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991); Babin v. Burnside Terminal, Greater Baton Rouge Port Commission, 577 So.2d 90 (La.App. 1st Cir.1990); Devereux v. Allstate Insurance Company, 557 So.2d 1091 (La.App. 2nd Cir.1990); Varnado v. Continental Insurance Company, 446 So.2d 1343 (La.App. 1st Cir.1984).
This assignment of error is without merit.

TACIT DEDICATION TO PUBLIC USE OF BUDDY ELLIS ROAD

(Assignment of Error 5)
DPS contends the trial court erred in failing to find that the Road became a public road by virtue of a tacit dedication for public use pursuant to La.R.S. 48:491. See A. Yiannopoulos, 2 Louisiana Civil Law Treatise, Property, § 95 and 100, pp. 204-205, 218-220 (1991).
La.R.S. 48:491(B)(1), as amended in 1985, reads as follows:
All roads and streets in this state which have been or hereafter are kept up, maintained, or worked for a period of three years by the authority of a parish governing authority within its parish, or by the authority of a municipal governing authority within its municipality, shall be public roads or streets, as the case may be, if there is actual or constructive knowledge of such work by adjoining landowners exercising reasonable concern over their property.
For the Road to be classified as a public road under La.R.S. 48:491 three things must be present: (1) the road must have been kept up, maintained, or worked for a period of three years, (2) the keeping up, maintenance and working must have been by the authority of the parish governing authority and (3) the owner must have had some type of knowledge or acquiescence in the maintenance.
The Road was occasionally "graded" by the Police Jury. Witnesses having knowledge of the grading or maintenance testified the maintenance was infrequent and occasional. Rudolph Ratcliff, employed by the Police Jury as Parish Superintendent between 1984 and 1987, testified that the Police Jury never purported to assume any maintenance responsibility for the Road or any jurisdiction over the Road, but always considered the Road to be owned by DPS.
The evidence establishes that only sporadic grading of the Road occurred between the time DPS entered into the servitude agreement with Crown and Smith's accident. Tacit dedication requires more *1180 than a casual or random maintenance of the road. Occasional "brushing up" or token maintenance will not suffice to establish a tacit dedication. Lincoln Parish Police Jury v. Davis, 559 So.2d 935 (La.App. 2nd Cir.1990). Ratcliff also testified that the only time the Police Jury graded the Road was at the request of DPS.
Finally, it should be observed that this is an unusual assignment of error for DPS to assert under the facts of this case. Lt. Robison of DPS testified that he asked Rudolph Ratcliff of the Police Jury to grade the Road. Ratcliff corroborated this testimony. However, under the Crown-DPS servitude agreement, DPS obligated itself not to "do or allow to be done any acts or act which shall cause said right of way to become a public road without the prior written consent of the GRANTOR [Crown]." The record herein contains no written consent by Crown authorizing DPS to request the Police Jury to grade the Road. Had the grading of the Road by the Police Jury resulted in a tacit dedication of the Road for public use, DPS would have been in violation of its contract with Crown and liable to Crown therefor.
DPS did not carry its burden of proving that a tacit dedication of the Road for public use took place. The factual determination by the trial court that the Road did not become a public road by virtue of the maintenance provided by the Police Jury is not clearly wrong.
This assignment of error is without merit.

OCCURRENCE OF THE ACCIDENT

(Assignment of Error 1)
DPS contends the trial court erred in finding that an accident occurred as testified to by Mrs. Smith.
Mrs. Smith testified the accident happened as follows:
Q. All right. Now, just tell the Court please, what happened? How your accident happened?
A. Yes, sir, I was trying to get down the road and I was driving as carefully as I could drive, and when that road floods, you have to pray yourself down it and that day, I forgot to pray, and when I topped this, there's a big culvert just about from where my entrance to the road is down by this red barn there's a creek there and a huge culvert, and that is just about the worst section on the road, and when I went down into that water, you have to go slow or you would drowned your car out, and you had, you can't go to the right and you can't go to the left because there are no ditches there, and the water is flowing, and so, you have to try to go through the middle. Hopefully, you can make it through. And in going through that one section, I hit a pothole that was submerged under the water, that I could not see and I certainly would not have hit it on purpose.
. . . . .
Q. Describe for us what you saw, you obviously left your home, you were driving down Buddy Ellis Road, describe for us what the conditions of the road were on that day, the day of the incident, Decmber [sic] 20, 1986?
A. That day?
Q. Yes, mam [sic].
A. There was water standing on the road from heavy, heavy rain and but once you leave my house on Jennifer Lane and you start going down the road, the, you can't tell how deep that water is until you get into it. You have to just try to go on and get out and drive as carefully as you can to get in and out of the road and to get home, safely.
. . . . .
A. Now, with the road flooded, you are not able to see the condition of the road; is that right?
Q. That is correct.
The trial court specifically found that the accident occurred as testified to by Mrs. Smith.
The Louisiana Supreme Court in Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989) stated the following:

*1181 It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo....
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong....
(Footnotes omitted; citations omitted)
After a thorough review of the record, we find no manifest error in this credibility determination by the trial judge.
This assignment of error is without merit.

LIABILITY OF DPS

(Assignments of Error 1, 2 and 3)
DPS contends the trial court erred by finding it at fault because (1) the accident "was caused solely by the gross negligence of the Plaintiff" and (2) a "pothole on a gravel road on which logging operations are being conducted is not a hazardous condition".

The Trial Court's Rationale
The trial court gave the following basic reasons for finding liability on the part of DPS:
It is clear that plaintiff and all of the other persons who acquired their property either directly from Crown Zellerbach or by mesne conveyance had an absolute right to legal passage over Buddy Ellis Road as it was the passage previously exercised before any sell offs occurred, as specifically mandated by La.Civ.Code art. 694.
Given those circumstances, it is clearly appropriate to conclude, as the Court does, that plaintiff and all other persons using the road as the sole means of ingress and egress to and from the various residences out there were "other parties" to whom the right of use of Buddy Ellis Road was granted, as contemplated by the servitude or right-of-way agreement. Certainly Crown Zellerbach had the authority to impose such obligation upon defendant, and it makes no sense to suggest that defendant had an obligation only to maintain the road for Crown Zellerbach but not for these other people. Obviously, even when defendant initially acquired the servitude or right-of-way, it assumed the obligation of constructing, *1182 improving or maintaining the road for the benefit of the Bobby Gill residence.
The Court accordingly concludes that the sole cause of the incident sued on herein was the negligence of defendant, State of Louisiana through the Department of Public Safety, in failing to fulfill its contractual and legal obligations to at least maintain Buddy Ellis road. Defendant should never have contractually undertaken to assume such obligation of maintenance without assuring itself of the means of accomplishing such undertaking.
Moreover, the Court notes that the servitude or right-of-way agreement, which includes the aforementioned maintenance obligation, is with the state of Louisiana, albeit represented in that instrument by Hickley M. Wagguespack, Director of Louisiana Department of Public Safety. This was, therefore, in essence a contractual obligation assumed by the State.
The proper methodology for analyzing this case is set forth in Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). In Socorro, 579 So.2d at 938-939, the court stated that the following questions should be answered to determine the responsibilities of the parties:
(1) Was the conduct in question a causein-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
We partially answered the first question in our review of DPS's assignment of error 1 concerning whether or not an accident occurred. Therein, we concluded that the trial judge was not clearly wrong in concluding that Mrs. Smith drove into a flooded area of the Road and struck a pothole. After reviewing the record, we also conclude that the trial judge correctly held that this accident was a cause-in-fact of an injury to Mrs. Smith's neck.
Next, we must consider what, if any, duties were owed by DPS, Crown and Mrs. Smith. The trial court held that DPS owed duties in contract and tort to the Smiths.

General Duties of Owner or Custodian of Immovable Property
The owner, or person having custody, of immovable property has a duty to keep such property in a reasonably safe condition. He must discover any unreasonably dangerous condition on his premises and either correct the condition or warn potential victims of its existence. This duty is the same under the strict liability theory of La.C.C. art. 2317 as under the negligent liability theory of La.C.C. art. 2315. Usually the difference in proof between these theories of liability is that under La.C.C. art. 2315, it must be shown that the owner, or person in custody, either knew or should have known of the risk, whereas under La.C.C. art. 2317, a claimant is relieved of proving the defendant's knowledge of the risk Clement v. State, Department of Transportation and Development, 528 So.2d 176 (La.App. 1st Cir.), writ denied, 532 So.2d 157 (La.1988). However, La.R.S. 9:2800 provides that even under a strict liability theory, when the defendant is a public entity, the plaintiff must prove that the defendant had actual or constructive knowledge of the particular vice or defect which caused the damage and failed to remedy it within a reasonable time. Under either theory of liability (when the defendant is a state entity), the plaintiff has the burden of proving that: (1) the property which caused the damage was in the "custody" of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises (breach of duty); (3) the defendant had actual or constructive knowledge of the risk; and (4) that the defect in the property was a cause in fact of the resulting injury. In both negligence and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Under either theory of liability, the court must decide if the risk which causes the injury is within the ambit of protection of the duty. Farr v. Montgomery Ward and *1183 Company, Inc., 430 So.2d 1141 (La.App. 1st Cir.), writ denied, 435 So.2d 429 (La. 1983).

Liability of DPS under La.C.C. art. 2317
As previously indicated, an essential element of a cause of action under La.C.C. art. 2317 is that the thing that caused the damage was in the custody (garde) of the defendant. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La. 1990).
Generally speaking, the owner of a thing has the custody (garde) of it. Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987). However, there may be situations where the custody (garde) of a thing reposes with someone other than the owner. In Loescher v. Parr, 324 So.2d 441, 449 n. 7 (La.1975) appears the following:
7. In Verlander, We are Responsible..., 2 Tulane Civil Law Forum, No. 2, p. 64 (1974), which contains a perceptive and thorough analysis of the French, Quebecois, and Louisiana interpretations, it is suggested: "[T]he things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them. This relationship will ordinarily be associated with ownership, but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairmen, among others. It will not belong to the agent or the mandatory, the employee or the servant, or to anyone else for whom there is a responsible principal. The owner may transfer the guardianship by transferring the thing to another who will bear such a relationship to the thing as to himself have the care of it. He may also lose the care of this thing, principally by the theft of the thing."
(Emphasis added)
See also Griffin v. Foti, 523 So.2d 935 (La.App. 4th Cir.), writ denied, 531 So.2d 272 (La.1988). In King v. Louviere, 543 So.2d 1327, 1328-1329 (La.1989), the court set forth the following rules for determining who had the custody (garde) of a thing:

Under La. Civil Code article 2317 the person who has the garde of a thing is he who has the legal duty to prevent its vice or defect from harming another. The determination of the existence of this duty is made through a process of policy considerations similar to that used in determining other delictual duties.... To assist the trier of fact in this deliberation this court has set forth several general principles: the liability arises from the guardian's legal relationship to the thing whose defect creates an unreasonable risk of injury to others.... The garde is the obligation imposed by law on the proprietor of a thing, or on one who avails himself of it, to prevent it from causing damage to others. The things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them.... The guardian is in a better position than the innocent victim to detect, evaluate and take steps to eliminate an unreasonable risk of harm arising in the thing.
. . . . .
In the present case, and in many others, a very important consideration in determining whether a person has the garde of a thing may be found in the policy established by related statutes.

(Emphasis added; citations omitted)
Determining who has the custody (garde) of a thing is a question of fact. Doughty v. Insured Lloyds Insurance Co., 576 So.2d 461 (La.1991); Coleman v. Otis Elevator Company, 582 So.2d 341 (La.App. 4th Cir.1991). Further, in Doughty, 576 So.2d at 464, appears the following:
Under most circumstances ownership alone establishes the requisite benefit, control and authority to find garde.... Article 477 of the civil code defines ownership as "the right that confers on a person direct, immediate, and exclusive authority over a thing. The owner of a thing may use, enjoy, and dispose of it *1184 within the limits and under the conditions established by law." Although ownership creates the presumption of garde, this presumption is rebuttable by the owner. To find otherwise would rewrite article 2317 to impose strict liability for the "ownership" of a defective thing rather than liability arising out of "custody" of the thing.
In Turner v. Turner, 455 So.2d 1374, 1379 (La.1984), the court discussed the effect of a rebuttable presumption as follows:
As in any matter in which there is a rebuttable presumption, the burden rests with the party challenging the presumption to convince the fact-finder that his proposed conclusion is more correct than the presumed one. A presumption does not have any probative value, but merely provides the fact-finder with a conclusion in the absence of proof to the contrary.... "Presumptions are indulged to supply the place of facts; they are never allowed against ascertained and established facts. When these appear, presumptions disappear."
See also La.C.C. art. 1851; La.R.S. 15:432; L. Hargrave, Presumptions and Burdens of Proof in Louisiana Property Law, 46 La.L.Rev. 225, 225-227 (1985).
It is uncontested in this case that the owner of the Road at the time of the accident was either Crown or Cavenham; DPS was not the owner of the Road. However, DPS could be liable under La.C.C. art. 2317 if it had the custody (garde) of the Road.
A review of the Crown-DPS conventional servitude agreement shows that Crown gave DPS a servitude of passage on the Road in consideration for which DPS agreed to "improve and maintain" the Road.[9] However, Crown retained the right to use the Road "at any and all times" and reserved the right to grant the right of use of the Road to others. Further, Crown limited the servitude grant only to DPS and its agents, employees, heirs and assigns, and obligated DPS not to do anything that would make the servitude subject to public use. In this factual and legal posture, the custody (garde) of the Road remained in Crown (and was passed on to Cavenham) for purposes of liability to third persons under La.C.C. art. 2317. This factual situation is analogous to that in Spott v. Otis Elevator Company, 601 So.2d 1355. (La. 1992). In Spott, Otis Elevator Company (Otis) manufactured an elevator that was purchased by Pelican Homestead & Savings Association (Pelican). Otis entered into a maintenance contract with Pelican and an Otis employee regularly inspected the elevator. The elevator malfunctioned and injured Spott. Spott asserted Otis had the custody (garde) of the elevator and was strictly liable to him pursuant to La.C.C. art. 2317, citing Coleman v. Otis Elevator Co., 582 So.2d 341 (La.App. 4th Cir.1991). The Louisiana Supreme Court rejected this argument with the following rationale:
The plaintiff's contention is without merit in this case. Pelican is the primary party benefitting from the elevators on its premises. Moreover, the facts in Coleman are distinguishable. In Coleman, Otis hired an employee to work forty hours a week at Charity Hospital to upgrade and to maintain the hospital's forty-eight elevators. Hence, Otis had garde of the elevators, the Otis employee being physically on the premises full time. Consequently, on the peculiar facts of Coleman, the court of appeal's determination that Otis had garde was sound. In this case, however, an Otis employee visited Pelican only weekly for a brief period of time. Moreover, a service contract by itself does not create garde. Hunt v. City Stores, Inc., 387 So.2d 585, 589 (La.1980) (construing a service contract provision with language identical to that in this case, we found the store owner was the sole custodian of the escalator); see also Brown [v. Otis Elevator Co.], supra, 535 So.2d [525] at 527 [(La.App. 4th Cir.1988)]. The service contract in this case, in fact, specifically provides that Pelican retains control of the elevator. Because we *1185 find Otis did not have garde of the elevator, Otis cannot be found strictly liable.
(Emphasis added)

Spott, 601 So.2d at 1363.
In the absence of specific statutory authority, Crown did not alter its legal relations with third persons using the Road when it entered into the contract with DPS. See, for example, La.R.S. 9:3221. Crown had, and retained, the duty to third persons to maintain the Road. Although Crown contracted with DPS to perform the maintenance, under the facts of this case Crown was still responsible, as the owner and custodian of the Road, to third persons for purposes of Article 2317. This situation is analogous to that where DOTD contracts for the construction, repair or maintenance of a public roadway, and the legal result herein should be the same. See Roberts v. State, Department of Transportation and Development, 576 So.2d 85 (La.App. 2nd Cir.), writ denied, 581 So.2d 685 (La.1991); Robinson v. State, Department of Transportation and Development, 454 So.2d 257 (La.App. 1st Cir.), writ denied, 458 So.2d 122 (La.1984) (concurring opinion of Shortess, J.). Because DPS did not have custody (garde) of the Road, it is not liable pursuant to La.C.C. art. 2317. Although Crown is not a party defendant, its duty and liability for the Road are relevant in these proceedings for the purposes of defining the duties of the parties and allocating percentages of fault. La.C.C. art. 2324; La.C.C.P. art. 1812.

Duty of DPS Under La.C.C. art. 2315
DPS owed a contractual duty to Crown (and subsequently Cavenham) to "improve and maintain" the Road. Generally, contractual duties are owed strictly by and to the parties to the contract. La.C.C. arts. 1983 and 1985. The DPS-Crown servitude agreement did not contain a stipulation pour autrui (third party beneficiary) provision in favor of the Smiths. La.C.C. arts. 1978-1982. However, in some instances, a party's assumption of a contractual duty may create a corollary or incidental tort duty in favor of third persons. See discussions in G. Morris, Developments in the Law 1988-1989: Business Associations, 50 La.L.Rev. 211 (1989). Thus, it has been held that a person who builds something pursuant to a construction contract owes a duty to third persons pursuant to La.C.C. art. 2315 to perform in a workmanlike manner free from defects attributable to either faulty materials or poor workmanship and, if the construction contract is negligently performed, a third person has a cause of action under Article 2315 for any injuries caused thereby. Clement, 528 So.2d at 179-180 and the cases cited therein. To determine whether DPS owed a tort duty to the Smiths pursuant to La.C.C. art. 2315, we must examine the nature of the DPS-Crown servitude contract and the pertinent laws applicable thereto.
Crown granted a conventional servitude of passage for a private road to DPS and its agents, employees, heirs and assigns. It was not contemplated by the parties that the Road would be a public road subject to public use.[10] The language of the contract clearly and unambiguously shows that the parties did not contemplate that the Road would be maintained as a public road subject to substantial residential traffic. Thus, DPS's obligation to maintain the Road only required the amount of maintenance necessary for DPS's use and that of Crown and "other parties" to whom Crown granted the right of use. In 1975, when the conventional servitude was executed, Crown used the Road for logging and continued to do so until the time of the accident herein. In 1975, the Road was made of gravel and dirt and was located in an isolated area. No testimony, expert or otherwise, was presented to show how much maintenance was reasonably necessary for a private, dirt and gravel, logging road in an isolated rural area. Further, no evidence was presented to show the cost of achieving the required amount of maintenance for 7,564.61 feet of roadway.
*1186 The trial court found Mrs. Smith "had an absolute right to legal passage over Buddy Ellis Road as it was the passage previously exercised before any sell offs occurred", citing La.C.C. art. 694 as authority. La. C.C. art. 694 provides as follows:
When in the case of partition, or a voluntary alienation of an estate or of a part thereof, property alienated or partitioned becomes enclosed, passage shall be furnished gratuitously by the owner of the land on which the passage was previously exercised, even if it is not the shortest route to the public road, and even if the act of alienation or partition does not mention a servitude of passage.
See the discussion of La.C.C. art. 694 in A. Yiannopoulos, 4 Louisiana Civil Law Treatise, Predial Servitudes, § 99, pp. 291-300 (1983). Implicit in this ruling by the trial judge is a holding that a voluntary alienation by Crown (that was binding on DPS) caused an enclavement of the Smith's property. Also implicit in the ruling is that because the Smiths have a right of passage under Article 694, they are "other parties" within the purview of the Crown-DPS servitude contract. Accordingly, we must look at the Smith's chain of title to see if and/or when a "voluntary alienation" by Crown caused an enclavement of the property on which the Smith's land is located. Further, DPS is a third person for purposes of any acts by Crown that created a servitude in favor of the Smiths.
The law applicable to this issue is set forth in Dallas v. Farrington, 490 So.2d 265, 269-270 (La.1986) as follows:
No conventional servitude was ever established. In the agreement to purchase, Farrington obligated himself as a condition of the sale to grant plaintiffs a servitude to use Roblaine Street for passage to their property, but the grant was omitted from the act of sale which transferred the property.
Contracts affecting immovable property must be recorded in order to affect third parties. La.R.S. 9:2721 and 2756. The public records doctrine is essentially a negative doctrine declaring that what is not recorded is not effective except between the parties, and a third party in purchasing immovable property is entitled to rely on the absence from the public records of any unrecorded interest in the property such as a sale or a grant of a servitude. Phillips v. Parker, 483 So.2d 972 (La.1986). Because recordation is essential for effectiveness against third parties, actual knowledge by third parties of unrecorded interests is immaterial. McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909); Redmann, The Louisiana Law of Recordation: Some Principles and Some Problems, 39 Tul.L.Rev. 491 (1965).

. . . . .
Legal Servitude
A legal servitude is a limitation on ownership imposed by law. La.C.C.Art. 659. The legal servitude of passage in favor of an enclosed estate is a limitation imposed by law on the ownership of lands surrounding the enclosed estate. La.C.C.Art. 689. The law affords the owner of an estate which has no access to a public road the right to demand forced passage across his neighbor's land which offers the shortest and most convenient route to a public road, usually upon payment of indemnity fixed by agreement or by the court. However, if property becomes enclosed because of an alienation of part or all of the remainder of the estate, passage must be furnished gratuitously by the owner of the land over which passage was previously exercised, even if it is not the shortest route to the public road. La.C.C.Art. 694.
(Italics in original)
See also Comment, The Right of Passage for the Benefit of an Enclosed Estate, 47 La.L.Rev. 199, 211-215 (1986). Any doubt as to the existence of a predial servitude must be resolved in favor of the servient estate. La.C.C. art. 730; Robert Investment Co., Inc. v. Eastbank, Inc., 496 So.2d 465 (La.App. 1st Cir.1986).
The record contains no conventional servitude of passage agreement by Crown (or Cavenham) in favor of Natchez, the Brackins or the Smiths for use of the Road. The record contains no evidence to show *1187 that Crown (or Cavenham) orally[11] granted a right to use the Road to Natchez, the Brackins or the Smiths. Pursuant to the Crown-DPS servitude agreement, DPS did not have the right to grant the use of the Road to third persons. Thus, if the Smiths had a right of passage on the Road, it had to be acquired pursuant to either La.C.C. art. 689 or La.C.C. art. 694. La.C.C. art. 689 provides as follows:
The owner of an estate that has no access to a public road may claim a right of passage over neighboring property to the nearest public road. He is bound to indemnify his neighbor for the damage he may occasion.
See A. Yiannopoulos, 4 Louisiana Civil Law Treatise, Predial Servitudes, §§ 90-98, pp. 260-291 (1983).
The three instruments by which the Smiths acquired title to their property from the Brackins were filed in evidence as Exhibit D-6. The property descriptions in these instruments state that the Smiths acquired Lots 5, 6 and 7 of Ashley Heights, Third Filing "all in accordance with survey plat prepared by Alvin Fairburn & Associates, Reg. C.E. & L.S., for Wayne and James Brackin, a copy of which is duly recorded in the official records of the Clerk and Recorder for Livingston parish." The survey plat was not filed in the record, and the three lots are not described by metes and bounds. Thus, the fact of enclavement can not be determined from the juridical acts by which the Smiths acquired their property.[12] However, Mrs. Smith testified that Jennifer Lane passed in front of her lots and gave her access to the Road.[13] Attached as Exhibit A to Mrs. Smith's deposition is a sketch of the area where she lives, and it shows her property is bounded on the west by a fence marked "S. Polic", on the south by property of E. King and on the east by Jennifer Lane. The ownership of the land bounding the Smith property on the north is not marked. Mrs. Smith testified her only access from her property to La. 447 is down Jennifer Lane to the Road and thence to La. 447. Assuming that the status of Jennifer Lane is not relevant, this evidence is sufficient to show the fact of enclavement. The remaining questions are what type of enclavement is this and who caused it.
On October 19, 1984, Crown and Natchez executed an act of exchange. In this instrument, Crown conveyed 32 tracts of land in Livingston parish to Natchez. Six of these tracts were located in Sections 10, 11, 12, 15 and 22 of Township 7 South, Range 3 East. Tract No. 19 is located in Section 11, contains 31.34 acres and is the tract from which Ashley Heights was developed. The description of Tract No. 19 shows it is in the W½ of the NE¼ and the E½ of the NW¼ of Section 11. The particular description of Tract No. 19 is a course and distance (land survey) description which also states that Tract No. 19 is bounded on the west by "the east line of property conveyed to the State of Louisiana, Dept. of Public Safety" and is bounded, in part, on the south by the "north margin of Buddy Ellis Road". The particular description does not give the ownership of the properties bounding Tract No. 19 on the north, east and part of the south. Because this property description does not give the ownership of the properties bounding Tract No. 19 on the north, east and part of the south, it does not exclude the possibility that Natchez owned property contiguous to Tract No. 19 (and possibly other tracts) and the possibility that such a contiguous tract had access to a public road. Natchez was not given a servitude of passage over the Road in the act of exchange. Accordingly, this instrument does not *1188 prove that Crown caused the Smith's property to be enclaved by alienation.[14]
During the testimony of Edward J. Murphy, DPS's expert witness on abstracts and title examination, the following took place:
Q. Mr. Murphy, these documents represent the acquisition by Jesse Warren Smith, Sr. and Jeanne Harwell Smith of their property in Ashley Heights Subdivision; do they not?
A. Yes, indeed, they do.
Q. And that is the property they presently own?
A. That's correct.
BY MR. SCHMIDT:
Your Honor, I would ask that these three instruments then, be entered as Defendant Department of Public Safety Six, in globo, and enter of record.
BY THE COURT:
So ordered.
Q. Mr. Murphy, in your examination of the title, you did not find where the Smiths obtained any right of way or use of the Buddy Ellis Road?
A. No, they did not.
Q. Nor did anyone else other than the State of Louisiana?
A. That's right.
Q. For a private road?
A. That's right.
Q. If you were to render a title opinion regarding the Smith's property, would you have an exception to the fact that there is no written right of way of ingress and egress to a public road?
A. Yes, I would, and in the whole of Ashley Heights, I would have to bring up the fact that there is as far as the Buddy Ellis Road goes, there is no access to it by any kind of deed of record in the Parish of Livingston, in the Conveyances.
BY MR. SCHMIDT:
Would you answer other counsel's questions, please.

CROSS EXAMINATION BY MR. DUE BY MR. DUE:
Q. Now, under those circumstances, these people would certainly have the right, under the law of Louisiana, to seek to get from Crown Zellerbach who created this situation, a right of ingress and egress, correct?
BY MR. MURPHY:
A. I suppose, yes, that's true, to the nearest public road, which I am not equipped to indicate where it would be.
BY THE COURT:
As I appreciate the law, and correct me if you think I'm wrong. The right of ingress and egress is not necessarily to the, it's to the nearest public road, by means of the nearest available and most convenient access.

BY MR. MURPHY:
That's right.
BY THE COURT:
Which in this instance would be the Buddy Ellis Road.
BY MR. MURPHY:
Would be the most conyeah, in fact, what is the most, you are right, what in fact, is the most convenient access to the public road, to the nearest public road, yeah.

BY THE COURT:
All right.
Q. In other words, if these people, if they took the position, okay, look, our ultimate successor in title was Crown Zellerbach Corporation, they couldn't, for example, come into court and force Crown Zellerbach to build them a brand new road where Crown Zellerbach could simply say that Buddy Ellis Road is already here and that will be your access to the public road; isn't that correct?
A. Yes, they could take that action is [sic] they wanted to, yes.
Q. Well, the point is, as the Judge is saying, the most logical way that this all would have been resolved would have been by having these people have the access, since Crown Zellerbach had *1189 it in their favor, the reservation, for them or anybody else that they wanted to have it flow, correct, you saw that in the servitude agreement?
A. Yes, that's right, Crown Zellerbach could, if they wanted to, grant it to anybody, yes.
Q. Or simply if they didn't want to, you know
A. If they were awarded it by the Court, yes.
(Emphasis added)
Murphy was not questioned about the ownership of the properties contiguous to the northern, eastern and part of the southern boundaries of Tract No. 19 when it was conveyed by Crown to Natchez in 1984.
A review of the above quoted exchange between Murphy and the trial judge shows that they were discussing the type of enclavement provided for in Article 689 and not that provided for in Article 694. Article 689 provides that "[T]he owner of an estate that has no access to a public road may claim a right of passage over neighboring property to the nearest public road." (Emphasis added) Article 689 must be construed in reference to Article 692 that provides as follows:
The owner of the enclosed estate may not demand the right of passage anywhere he chooses. The passage generally shall be taken along the shortest route from the enclosed estate to the public road at the location least injurious to the intervening lands.

(Emphasis added)
The trial judge and Murphy both referred to "the nearest public road" as provided for in Article 689 and both referred to the "most convenient access" as provided for in Article 692. Article 694 states that the right of passage must be over the land of the owner who caused the enclavement by alienation "even if it is not the shortest route to the public road." Thus, the evidence is insufficient to show that Crown caused an enclavement by alienation under Article 694, and, the factual ruling by the trial judge to the contrary is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). If the enclavement by alienation was caused by Natchez or the Brackins, their property, and not that of Crown, would be subject to the Article 694 servitude.
However, the Smiths have proved they are entitled to claim a legal servitude of forced passage pursuant to La.C.C. arts. 689-692. They have further established that utilization of the Road would be the appropriate way to exercise this right. However, the right to a legal servitude of forced passage pursuant to La.C.C. art. 689 is not selfexecuting. In A. Yiannopoulos, 4 Louisiana Civil Law Treatise, Predial Servitudes, § 96, pp. 284 and 285 (1983) appears the following:
According to Louisiana jurisprudence, supported by doctrinal considerations, the Civil Code merely confers on the owner of an enclosed estate the right to demand the establishment of a servitude of right of way on neighboring lands; it does not by itself give rise to a servitude of right of way nor does it confer on the owner of the enclosed estate authority to use a particular part of the neighboring lands as a passageway to a public road. The servitude of right of way comes into existence when the route of access to a public road is fixed by agreement of the neighbors or by a judicial decision. A permission to use the land of a neighbor for access to a public road does not suffice; it "cannot be considered as a grant of the servitude of way, or as an acknowledgment that passage was due."
Thus, the owner of an enclosed estate is not entitled to injunctive relief or to possessory protection when a neighbor refuses to let him cross his land in order to gain access to a public road. He is entitled to such relief when he shows that he has the right of way on "a determined part" of the servient estate "by obtaining from the defendant, or contradictorily with him from the court, a designation of the place in which it is to be exercised."
(Emphasis added)
Further, if the Smiths claim a legal servitude of forced passage over the Road they must indemnify Crown for any damage it may occasion. La.C.C. art. 689. Finally, if *1190 the Smiths claim a legal servitude of forced passage, they only receive a right to cross their neighbor's land; the neighbor (servient estate) is not obligated to build and maintain a roadway for the use of the dominant (enclosed) estate. La.C.C. art. 691 provides as follows:
The owner of the enclosed estate may construct on the right of way the type of road or railroad reasonably necessary for the exercise of the servitude.
See, for example, Martini v. Cowart, 23 So.2d 655 (La.App. 2nd Cir.1945). Had the Smiths obtained a right of passage over the Road pursuant to Article 689, they would have had an obligation to build and/or maintain the Road pursuant to Article 692.
There is no evidence in the record to show that prior to the accident Crown (or Cavenham) gave the Smiths a conventional servitude agreement to use the Road, or that the Smith's right to use the Road was fixed by a judicial decision. In this factual and legal posture, Mrs. Smith used the Road without the legal consent of Crown. However, as observed in Entrevia v. Hood, 427 So.2d 1146, 1150 (La.1983), this status does not bar the Smiths' recovery of damages as a matter of law; it is only relevant to the issues of "the magnitude of the risk posed and the gravity of the harm threatened".
The evidence shows that DPS was aware at some point in time that properties along the Road were being developed for residential purposes and that the only access the residents had to their properties was along the Road. However, DPS was not the cause of the enclavement of the properties, and, on the face of the public record, none of these people had a conventional servitude of passage in his favor. Although the Crown-DPS servitude agreement obligated DPS not to "allow to be done any acts or act which shall cause said right of way to become a public road", DPS "tolerated" the use of the Road by the residents. DPS's general counsel, Howard P. Elliot, Jr., gave the following testimony concerning this:
Q. Now, can you tell me what was the understanding as to what that was all about? Was this that Crown Zellerbach didn't want to ... You tell me what ...?
A. I think when we first acquired this property, we were under the opinion that this was going to be our road for getting back and forth to the property that we had acquired back there. And we knew that Crown did use this property and would continue to use it and that Crown did not want to give up, I guess, you know, the road without an agreement that we were going to maintain it. So, we agreed that we would take care of the road and that way, Crown would benefit from our maintenance and we would benefit by getting the use of the road.
Q. Okay. But certainly, at some point along in time, as you have previously indicated, Crown started selling off land to people; correct?
A. Right.
Q. And you knew then, by you, I am of course talking in terms of the Department of Public Safety, that you knew at that time, that these people, this was going to be their only means of getting to their land that they had bought for their homesites; correct?
A. Yes. We were somewhat concerned when the lots were being sold out there. The primary concern that we had was, that these people were going to later have to complain about the activities that we were conducting out there, and that they would be located in close proximity to our pre-existing property.
Q. But again, the Department of Public Safety never went to Crown Zellerbach and said, hey, wait a minute, look, you know, we are just going to maintain this road for you and we are not going to maintain it for any of these people who you are selling homesites to?
A. Right.
Q. None of that was ever considered, right?
A. No.
Q. And the Department of Public Safety certainly never considered any of these people who had bought homesites *1191 out there, to be trespassing on the road, did you all?
A. No.
Q. Okay. And you certainly didn't consider the school bus to be trespassing on the road, to go pickup the kids out there?
A. No, we, we were [sic] tolerated the use of the road because that was the only way they had to get access to their property and of course, you know, public relations is an important aspect of any public agency.
Q. Okay. For example, you all never told, when all the hoopla was going on, and before the situation finally got resolved, the Department of Public Safety never got up there and took the position, none of these people have any right to use this road, and that they were trespassing, or anything like that, did you all?
A. No.
After considering all of the facts and circumstances of this case and the applicable law, we conclude that DPS owed a tort duty to third persons using the Road to maintain the Road as a private, rural, gravel and dirt, logging road. DPS did not owe a contractual duty to the Smiths to maintain the Road, and the trial judge's ruling to the contrary on this issue is wrong as a matter of fact and law.
In Dobson v. Louisiana Power and Light Company, 567 So.2d 569, 573 (La. 1990), the court defined the duty that a person has to protect himself as follows:
Any person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have.
See also Putman v. Gulf States Utilities, 588 So.2d 1223 (La.App. 1st Cir.1991). In Socorro, the court held it was the primary duty of a diver to ascertain the safety of diving head first into untested waters. Socorro, 579 So.2d at 939. By analogy, we hold that Mrs. Smith had the primary duty under the facts of this case to ascertain the safety of driving through the flooded portion of the Road. Mrs. Smith had been living in Ashley Heights and using the Road 2 or 3 times a week since September of 1986. She knew logging operations were being conducted on land in the area and that the Road was being used by logging trucks. She was well aware of the condition of the Road on December 20, 1986, because the day was sunny and just prior to the accident she had attempted to drive around a pothole in the Road and slipped into the roadside ditch. The fact that flood water concealed the condition of the surface of the Road should have increased her precautions for protecting herself.
DPS's duty to maintain the Road is no greater than the duty of the owner of the Road, and that is to keep the Road in a reasonably safe condition as a private, rural, dirt and gravel, logging road. As observed in Socorro, 579 So.2d at 939 "[W]hether a particular risk is unreasonable is a difficult question which requires a balance of the intended benefit of the thing with its potential for harm and cost of prevention." Further, DPS "is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care or which was as obvious to a visitor as to the landowner." Shelton v. Aetna Casualty and Surety Company, 334 So.2d 406 (La.1976); Tisdale v. State, Departments of Transportation and Natural Resources, 581 So.2d 1045 (La.App. 1st Cir.), writ denied, 588 So.2d 1121 (La.1991). Mrs. Smith knew the Road had potholes in it, she saw the Road was flooded, and she should have known that the flood waters could conceal a pothole. She only reduced her speed to approximately 15 miles per hour. She should have reduced the speed of her vehicle sufficiently to accommodate the presence of a concealed pothole. She did not do so and struck a pothole with sufficient force to damage the rim of her left front tire and injure her neck.
An essential element of Mrs. Smith's negligence cause of action against DPS *1192 under La.C.C. art. 2315 is that DPS knew, or should have known, of the risk that caused her injuries. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La. 1982); Farr v. Montgomery Ward and Company, Inc., 430 So.2d 1141 (La.App. 1st Cir.), writ denied, 435 So.2d 429 (La. 1983). The evidence shows that DPS knew of the general condition of the Road. However, there is no evidence to show that DPS knew, or should have known, of the existence of the pothole Mrs. Smith struck. Mrs. Smith testified she traveled the Road 2 or 3 times a week but did not see the pothole she struck prior to the accident. She testified "There had not been any really deep, deep, potholes" and that "one day a pothole will be somewhere, the next day, it won't". She further testified the pothole she struck "was filled up because of the shifting sand in that area" shortly after her accident. Further, because of the transitory nature of the pothole Mrs. Smith struck, there is no evidence that DPS's failure to maintain the Road caused the pothole to exist. The Road was a dirt and gravel logging road that was being used for logging purposes. Mrs. Smith correctly noted that in these circumstances "Potholes open, potholes close."[15] The factual findings of the trial court to the contrary are manifestly erroneous. Because Mrs. Smith has failed to prove that DPS knew, or should have known, of the pothole she struck, and failed to prove that DPS's failure to maintain the Road caused the pothole to exist, DPS is not liable to Mrs. Smith.
These assignments of error have merit.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered in favor of DPS and against Mrs. Smith dismissing Mrs. Smith's petition with prejudice. Mrs. Smith is cast for all costs.
REVERSED AND RENDERED.
CRAIN, J., concurs with reasons.
WATKINS, J., concurs for the reasons assigned by CRAIN, J.
GONZALES, J., respectfully dissents.
SHORTESS, J., dissents and assigns reasons.
CRAIN, Judge, concurs.
I concur with the result. The plaintiff was allegedly injured when she hit a pothole while driving through the flooded area of a road. She twice testified that she had never seen a pothole in that particular area, even as recent as the day before. Regardless of the duty of the Department of Public Safety, it could not reasonably be expected to repair a pothole that apparently came into existence as the result of flooding, with the water still there. The plaintiff was aware that flooding could cause potholes. A point is reached where a person who takes deliberate action in face of a known risk must bear the responsibility for the results of that action.
I concur.
SHORTESS, Judge, dissenting.
The plurality's reasoning reminds me of the carnival shell game. Now you see it, *1193 now you don't. That pothole is around here, somewhere, but where, no one knows.
In my opinion, the trial court was not clearly wrong in finding the pothole represented an unreasonably dangerous condition. This circuit has found similar potholes to be unreasonably dangerous. See Miller v. State of Louisiana, 572 So.2d 197 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1114 (La.1991) (a road in the Pearl River Wildlife Management Area with a five-to six-inch depression across the road considered unreasonably dangerous); Miller v. Great Atlantic & Pacific Tea Co., 510 So.2d 695 (La.App. 1st Cir.), writ denied, 513 So.2d 1213 (La.1987) (a pothole in the parking lot of a supermarket was considered unreasonably dangerous). Admittedly, in Lognion v. Calcasieu Parish Police Jury, 503 So.2d 1092 (La.App. 3d Cir.), writs denied, 507 So.2d 227 (La.1987), the third circuit did say that a three-inch washboard was not an unreasonably dangerous condition for purposes of liability under Civil Code article 2317; however, the court also found the police jury liable under Civil Code article 2315 for not properly maintaining the gravel road.
The questions presented here are essentially fact questions. Maples v. Merrimack Mutual Fire Ins. Co., 567 So.2d 1178 (La.App. 3d Cir.1990), writ denied, 572 So.2d 64 (La.1991). The accident occurred on December 20, 1986. The last time defendant graded the road was January 13, 1986, almost one year prior to the accident. Defendant received numerous complaints over the general condition of the road prior to the accident. According to the testimony of Howard Elliott, Jr., defendant's general counsel, defendant knew the road was being used by the general public, and because "public relations is an important part of any public agency," Elliott stated the public was allowed to use the road.
The pothole was large enough to bend the rim of plaintiff's tire and snap her head back even at the slow rate of speed she was traveling. From the facts as set forth in Judge Lanier's regular opinion, the trial court's finding the state at fault is "reasonable in light of the record reviewed in its entirety." Rosell v. ESCO, 549 So.2d 840 at 844.
I would affirm but would also amend to cast plaintiff with some of the fault. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
I respectfully dissent.
NOTES
[1] Retired Captain William T. Poe of the Louisiana State Police testified that the first "couple of hundred feet" on the east (La. 447) end of the Road belonged to the Juban family.
[2] The Juban property is apparently located in Section 12, Township 7 South, Range 3 East. The Juban servitude agreement was not filed in evidence.
[3] The conveyance by which Mr. Haggard obtained his property was not discussed or filed of record.
[4] In his testimony, Trooper Robison implied that Crown removed the bridge over West Colyell Creek.
[5] On January 3, 1986, the Brackins and the Smiths executed an act of correction of the sale. On April 15, 1988, the Smiths bought lot 5 from the Brackins.
[6] No documentary evidence or act of conveyance was filed in evidence in connection with this testimony.
[7] In her deposition of July 27, 1990, filed in evidence as D-2, Mrs. Smith estimated the distance as ½ mile (2,640 feet). Daniel Haggard testified he lived about 0.8 mile west of La. 447 and the red barn was located 700 to 800 feet east of his home (3,400 feet from La. 447).
[8] If DPS wanted to join Crown, it should have joined it as a third party.
[9] The servitude agreement also obligated DPS to "construct" the Road. This obligation is meaningless because the Road was constructed prior to the execution of the contract.
[10] See A. Yiannopoulos, 2 Louisiana Civil Law Treatise, Property, § 96, pp. 205-207 (1991). On September 5, 1990, Cavenham granted a conventional servitude for public use of the Road to the Police Jury. The length of the road subject to this servitude was stated as "8,100 feet".
[11] We do not rule on whether or not the granting of oral right to use the Road would be binding on DPS.
[12] Compare the boundary agreement between Crown and DPS dated October 17, 1975, filed in evidence as Exhibit P-3 which states "[T]he foregoing described properties [of DPS] are completely surrounded by land owned by CROWN...."
[13] The record does not reflect if Jennifer Lane is a public or private road.
[14] The act of sale from Natchez to the Brackins has the identical property description for Tract No. 19 as did the Crown-Natchez exchange.
[15] For cases on the issue of whether a pothole in a dirt and gravel logging road is an unreasonable risk, compare the following cases in which no liability was found, Bealer v. National Tea Co., 597 So.2d 1242 (La.App. 3rd Cir.1992) (pedestrian stepped in a pothole 2.5 feet wide and 12 inches deep with a chunk of concrete in the bottom of it at a construction site); Maples v. Merrimack Mutual Fire Insurance Company, 567 So.2d 1178 (La.App. 3rd Cir.1990), writ denied, 572 So.2d 64 (La.1991) (pedestrian stepped in 4 to 6 inch rut in a driveway); Paul v. Commercial Union Insurance Company, 535 So.2d 1319 (La.App. 5th Cir.1988) (pedestrian fell in a 6 inch deep mud hole at a construction site that was a sea of mud and water littered with construction debris); Lognion v. Calcasieu Parish Police Jury, 503 So.2d 1092, 1095 (La.App. 3rd Cir.), writ denied, 507 So.2d 227 (La.1987) (potholes and washboards in roadway), with the following cases that found fault, Miller v. State, 572 So.2d 197 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1114 (La.1991) (5 to 6 inch depression across the entire width of a blacktopped road); Miller v. Great Atlantic & Pacific Tea Co., 510 So.2d 695 (La.App. 1st Cir.), writ denied, 513 So.2d 1213 (La.1987) (pothole in supermarket parking lot).