657 So.2d 610 (1995)
STATE of Louisiana, ex rel. William J. GUSTE, Jr., Attorney General
v.
Douglas D. "Doug" GREEN, Commissioner of Insurance.
No. 94 CA 1138.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
*611 Jack Brook, New Orleans, for plaintiff/appellee, Jim Brown, Com'r of Ins. State of La.
Patrick F. McGrew, Baton Rouge, for defendants/appellants, Enterprise Corp. Services, Inc. and Standard Equip. Leasing Co.
Frank Sloan, Covington, for defendant/appellee, Physicians Reliance Ass'n, Inc.
Thomas Gibbs, Baton Rouge, for defendants/appellees, Physicians Nat. Legal Defense Corp. and Strategic Leasing Corp.
Frank A. Silvestri, Peter Derbes, New Orleans, for defendants/appellees, Imre Hegedus, J.P. Jarboe, Richard Margeson, Myron Persoff and Parnell N. Avery, M.D.
Larry M. Roedel, Baton Rouge, for defendant/appellee, Rainell McDonald.
Erich Rapp, Baton Rouge, for defendant/appellee, Travis Nichols.
Before LeBLANC, PITCHER and FITZSIMMONS, JJ.
LeBLANC, Judge.
This appeal is from a trial court judgment finding certain corporate defendants to be a single business enterprise and granting a permanent injunction prohibiting the named defendants from disposing of their assets and records and the assets and records of Physicians National Risk Retention Group, Inc., (Physicians National). The trial court found Enterprise Corporate Services, Inc. (ECS) and Standard Equipment Leasing Company (SEL), along with several other named defendants not before us in this appeal, constitute a single business enterprise (the SBE defendants) under the direction and control *612 of defendant Douglas S. Crucet. The trial court issued a mandatory injunction prohibiting the SBE defendants from disposing of any assets and records, and ordered the SBE defendants to deliver all their assets to the Commissioner of Insurance for the State of Louisiana, as Liquidator of Physicians National.
ECS and SEL have appealed the judgment of the trial court, raising the following issues for review: 1) the use of summary proceedings; 2) the denial of a trial by jury; 3) the failure to join indispensable parties; 4) certain evidentiary rulings; 5) the failure to require proof of injury; 6) the finding by the trial court of a single business enterprise; and 7) the unconstitutionality of the appointment of the judge and the creation of the court which rendered judgment in this matter.

SUMMARY PROCEEDINGS
In their first assignment of error, ECS and SEL argue the trial court erred in utilizing summary proceedings in this matter in which the Commissioner sought and obtained a declaratory judgment. ECS and SEL assert the exclusive listing in La.C.C.P. art. 2592 does not authorize summary proceedings in declaratory judgment proceedings and that the substance of a declaratory judgment is not a matter which may be heard by summary proceedings.
La.C.C.P. art. 2592 provides, in pertinent part:
Summary proceedings may be used for trial or disposition of the following matters only:
* * * * * *
(3) An issue which may be raised properly by an exception, contradictory motion, or rule to show cause.
The present proceedings were instituted under the authority of La.R.S. 22:731 et seq., the controlling statutory provisions for the merger, rehabilitation, liquidation, conservation, dissolution, and administrative supervision of insurers in Louisiana. La.R.S. 22:733 B provides:
The commissioner of insurance may apply by petition to the district court of the parish in which said insurer has its principal office, or to the district court of the parish of East Baton Rouge, or to any one of the judges thereof should the court be in vacation, at the commissioner of insurance's sole option, for a rule to show cause why an order to rehabilitate, conserve, liquidate, or dissolve such insurer as provided in this Part should not be entered, and for such other relief as the nature of the case and the interest of the insurer's policyholders, members, stockholders, creditors, or the public may require. (Emphasis added.)
The statutory scheme clearly authorizes the commissioner of insurance to proceed by a rule to show cause. This authority is granted to the commissioner for proceedings to liquidate, as in this case, and "for such other relief as the nature of the case and the interest of the insurer's policyholders, members, stockholders, creditors, or the public may require." This language is intentionally broad so as to give the commissioner latitude in performing his duties as liquidator. The declaratory judgment sought by the commissioner was just such "other relief that the nature of the case required and the statute authorized.
The statute authorizes the commissioner to proceed by rule to show cause, a summary proceeding, in a liquidation proceeding and its ancillary proceedings. This assignment is without merit.

JURY TRIAL
ECS and SEL also argue the trial court erred in denying their request for a jury trial. Appellants argue the issue before the court and the court's finding in regards to the existence of a single business enterprise (SBE) is a question of fact, citing Green v. Champion Ins. Co., 577 So.2d 249, 257 (La.App. 1st Cir.), writ denied, 580 So.2d 668 (1991). As a question of fact, appellants contend the SBE issue should have been triable to a jury.
La.C.C.P. art. 1732 provides, in pertinent part:
A trial by jury shall not be available in:
* * * * * *

*613 (3) A summary ... proceeding.
This matter arose out of the liquidation proceedings instituted by the commissioner under La.R.S. 22:733, which authorizes summary proceedings for "such other relief" as the case may require. A trial by jury is not available for summary proceedings. This assignment is without merit.

INDISPENSABLE PARTIES
In their next assignment of error, ECS and SEL argue the trial court erred in denying their exception raising the objection of failure to join indispensable parties. Appellants assert creditors of ECS and SEL should be joined. They maintain that the distribution of ECS's and SEL's assets, as a result of the SBE determination, upsets the rights of the creditors of ECS and SEL. Therefore, they allege the creditors are indispensable parties.
An indispensable party is one whose interest in the subject matter of the litigation is so interrelated that a complete adjudication of the controversy cannot be made unless he is joined in the action. La.C.C.P. art. 641. Smith v. State Through Dept. of Public Safety, 620 So.2d 1172, 1178 (La.App. 1st Cir.1992). The jurisprudence of this state holds that a party is indispensable only when the facts clearly establish that no complete and equitable adjudication of the controversy can be made in his absence. Carter v. Baton Rouge Par. Emp. Ret., 612 So.2d 765, 767 (La.App. 1st Cir.1992). Based on the lack of a factual showing by appellants, we are unable to ascertain the rights of an unidentified and unnamed group of creditors who may have some claim against ECS or SEL. This assignment is without merit.

EVIDENTIARY RULINGS
In this assignment of error, appellants urge the manner in which the trial was conducted deprived them of their rights to due process. In their brief appellants, rather than dwell upon a specific evidentiary ruling as being reversible error, list six items which they assert exemplify the faulty manner in which the trial was conducted.
Appellants protest the trial court's limitation of questioning of Mr. Eric Schmidt in regards to the existence of certain documents. Appellants contend these documents concern the reinsurance transaction by and between Physicians National and Builders and Contractors Insurance Company, Inc. (Builders and Contractors).
The trial court correctly ruled that testimony concerning any transaction by Builders and Contractors was not relevant to the issue of whether ECS, SEL and Physicians National should be declared a SBE.
ECS and SEL also argue the trial court erred in overruling their objections to the hearsay testimony and evidence offered by Mr. Corsey Carson and Mr. John Crick. Appellants assert Carson and Crick were merely in possession of the documents and could not identify and qualify them as business records.
La.C.E. art. 803(6) provides, in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * * * * *
(6) Records of regularly conducted business activity. In a civil case, a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, of diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
The testimony at issue is the unrebutted testimony which establishes Crick, as court appointed deputy conservator, identified the records as the business records of Physicians National and was competent to give testimony as a "custodian or other qualified witness". In addition, there was nothing to *614 indicate any lack of trustworthiness nor have appellants made any showing that their substantial rights have been affected. See La. C.E. art. 103 A.
Next, appellants assert the court's allowing hearsay testimony by Mr. Louis Coppage and others was error. However, again, appellants have not shown how any error in the trial court's rulings affected their substantial rights. The mere assertion in their brief of "a lot of other hearsay testimony of a very similar nature" does not complain of errors which this court can review.
Appellants also argue testimony given by several witnesses was not made with first hand knowledge. ECS and SEL maintain this error concerning the testimony by Mr. Crick. However, Mr. Crick's appointment and service as deputy conservator of Physicians National supported his qualification to testify. Mr. Coppage's testimony concerned the initial formation of Physicians National, its assets, and its inadequate capitalization, matters which he was involved with. Mr. Richard Louden's testimony concerned his personal knowledge of the routine management of Physicians National, based on his own attendance at weekly management meetings. Likewise, Mr. Dan O'Neal, a salesman for Physicians Reliance Group, testified to his personal knowledge of the marketing and sales system utilized by the SBE defendants. Ms. Sally Ritter and Mr. Parker Harvey, underwriters for ECS, each testified to the shared employees and offices, and the common policy of the SBE defendants. Mr. Allen Buchalter, actively involved in the formation of Physicians National Risk Retention Group and part owner of Ballantyne, Inc., testified from his personal knowledge concerning the operations and organization of some of the SBE defendants. It was not error to allow the testimony of these witnesses.
The next item listed which appellants assert contributed to the lack of due process was the trial court's denial of the appellants' exception raising the objection of vagueness in regard to the commissioner's petition. ECS and SEL asserted in their exception "[t]he Plaintiff's Petition ... is vague ... in that the allegations against ECS [and SEL] made in the Petition ... are conclusionary and nonfactual."
La.C.C.P. art. 891 requires a petition to "contain a short, clear, and concise statement of all causes of action arising out of, and of the material facts of, the transaction or occurrence that is the subject matter of the litigation ... and ... conclude with a prayer for judgment for the relief sought." The petition in the instant case identifies twenty defendants, including ECS and SEL, alleges a corporate structure and interrelationship among the defendants by supplying particulars concerning the ownership, alliances, and connections alleged between the defendants, and asserts an action for damages listing acts of alleged negligence, and an action for declaratory judgment, injunction, and sequestration. The prayer includes six specific requests for relief, plus any general and equitable relief.
One purpose of the exception of vagueness is to place the defender on notice of the nature of the facts sought to be proved so as to enable him to identify the cause of action. Nicholson v. Holloway Planting Company, Inc., 284 So.2d 898, 902 (La.1973), Washington v. Flenniken Construction Company, 188 So.2d 486, 489 (La.App. 3rd Cir. 1966).
The petition fairly informs the defendants of the nature of the cause of action and includes sufficient substantial particulars to enable the defendants to prepare their defense.
The last item in the defendants' list is the limits placed on cross-examination of certain witnesses concerning transactions which occurred in 1991, after ECS was discharged by Physicians National and was no longer performing management functions. Appellants assert "Counsel for the appellants attempted to cross examine the Commissioner's witnesses in regards to events that occurred in 1991 but was prevented from doing so by the court" and include a volume and page reference to the record. Our careful review of the record indicates the objection at issue made by counsel for the commissioner was overruled, and counsel for appellants was instructed *615 to proceed with cross examination. This assignment is without merit.

IRREPARABLE HARM
ECS and SEL argue the trial court erred in granting a mandatory injunction without a showing of irreparable harm.
La.C.C.P. art. 3601 authorizes the issuance of an injunction "in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law...." This provision authorizes an injunction in two separate instances: First, where the applicant suffers some irreparable injury, and second, in any other case where an injunction is specifically provided as the appropriate remedy. Chapman v. Fisher, 370 So.2d 162, 165 (La.App. 3rd Cir.1979).
The trial court's issuance of an injunction was pursuant to the authority granted in La.R.S. 22:734 which provides:
The court shall have jurisdiction over matters brought by or against the Department of Insurance or the commissioner of insurance, at any time after the filing of the petition, to issue an injunction restraining such insurer and its officers, agents, directors, employees, and all other persons from transacting any insurance business or disposing of its property until the further order of this court. The court may issue such other injunctions or enter such other orders as may be deemed necessary to prevent interference with the proceedings, or with the commissioner of insurance's possession and control or title, rights, or interests as herein provided or to prevent interference with the conduct of the business by the commissioner of insurance, and may issue such other injunctions or enter such other orders as may be deemed necessary to prevent waste of assets or the obtaining of preferences, judgments, attachments, or other like liens or the making of any levy against such insurer or its property and assets while in the possession and control of the commissioner of insurance.
Therefore, because an injunction is specifically provided as a remedy in La.R.S. 22:734, it was unnecessary for the commissioner to show irreparable injury when seeking injunctive relief in a liquidation proceeding to restrain persons from disposing of property, prevent interference, or to prevent waste. The commissioner is entitled to injunctive relief. This assignment is without merit.

SINGLE BUSINESS ENTERPRISE
ECS and SEL also allege as error the trial court's finding that appellants were part of a single business enterprise (SBE). Whether an affiliated group of entities constitutes a "single business enterprise" is a question of fact to be decided by the trial court. Brown v. Automotive Cas. Ins. Co., 93-2169, p. 8 (La.App. 1st Cir. 10/7/94); 644 So.2d 723, 728, writ denied, 94-2748, (La. 1/6/95), 648 So.2d 932; Green v. Champion Ins. Co., 577 So.2d 249, 257 (La.App. 1st Cir.), writ denied, 580 So.2d 668 (1991). For an appellate court to reverse a factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Moreover, where conflict exists in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Stobart, 617 So.2d at 882.
The following factors have been utilized to determine whether a group of entities constitute a "single business enterprise":
1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;
2. common directors or officers;
3. unified administrative control of corporations whose business functions are similar or supplementary;
4. directors and officers of one corporation act independently in the interest of that corporation;
5. corporation financing another corporation;

*616 6. inadequate capitalization ("thin incorporation");
7. corporation causing the incorporation of another affiliated corporation;
8. corporation paying the salaries and other expenses or losses of another corporation;
9. receiving no business other than that given to it by its affiliated corporations;
10. corporation using the property of another corporation as its own;
11. noncompliance with corporate formalities;
12. common employees;
13. services rendered by the employees of one corporation on behalf of another corporation;
14. common offices;
15. centralized accounting;
16. undocumented transfers of funds between corporations;
17. unclear allocation of profits and losses between corporations; and
18. excessive fragmentation of a single enterprise into separate corporations.
Green, 577 So.2d at 257-58.
This list is illustrative and is not intended as an exhaustive list of relevant factors. No one factor is dispositive of the issue of "single business enterprise." Green, 577 So.2d at 258.
Considering the above factors and the scope of our review on appeal, we conclude that the record contains abundant evidence to support the trial court's finding. The trial court, in oral reasons, stated:
WE START OFF WITH THE PROPOSITION HERE THAT THE STATE IS ASKING THAT ECS, ECSIA AND SEL, THREE CORPORATIONS WHICH WERE FORMED BY MS. CARPENTER AND HER SISTER PRIMARILY CONSTITUTE A SINGLE BUSINESS ENTERPRISE WITH CORPORATIONS KNOWN PRIMARILY AS PHYSICIANS NATIONAL RISK RETENTION GROUP, WHICH WAS THE HOLDING COMPANY, YOU MIGHT SAY FOR THIS ELABORATE NETWORK OF CORPORATIONS WHICH INVOLVE SOME 12 OR 15 CORPORATIONS, ONLY 12 OF WHICH ARE INVOLVED IN THIS LITIGATION. SOME OTHERS, OF THOSE THREE OF FOUR, HAVE BEEN DISMISSED BECAUSE THEY ARE IN BANKRUPTCY.
THE QUESTION OF SINGLE BUSINESS ENTERPRISE IS DETERMINEDTHE RESOLUTION OF THAT ISSUE IS DETERMINED BY NUMEROUS FACTORS, WHICH ALL COUNSEL HAVE TOUCHED UPON, STEMMING FROM THE GREEN CASE AND FROM THE CAR CASE, I BELIEVE ARE THE ONLY TWO CASES IN LOUISIANA JURISPRUDENCE WHICH HAVE DEALT WITH THIS PARTICULAR CONCEPT. BOTH CASES OUTLINED SOME 16 OR 17 POINTS WHICH THE COURT WILL CONSIDER IN MAKING A DETERMINATION AS TO WHETHER OR NOT A BUSINESS WHICH IS PART OF A CONGLOMERATE OR AN AFFILIATE, OR WHATEVER, CONSTITUTES A SINGLE BUSINESS ENTERPRISE TO THE EXTENT THAT ITS ASSETS CAN BE HELD LIABLE FOR THE DEBTS OF THE PARENT CORPORATION OR ANY OTHER CORPORATION IN THE GROUP ON THE GROUNDS THAT IT'S ALL ONE SINGLE BUSINESS ENTERPRISE.
SOME OF THE MOST IMPORTANT ELEMENTS, IN THE OPINION OF THIS COURT IS, AND ARE LISTED IN THOSE, IS FIRST OF ALL WHY WAS THIS COMPANY FORMED AND UNDER WHAT CIRCUMSTANCES WAS IT FORMED? THAT HAS A CONSIDERABLE BEARING ON WHETHER OR NOT IT IS A SINGLE BUSINESS ENTERPRISE. WITH REGARD TO THAT ISSUE THE COURT IS AWARE OF THE TESTIMONY, PRIMARILY OF MR. BUCHALTER, WHO TESTIFIED THAT HE WAS CONTACTED BY MR. CRUCET, I THINK, IN 1986 CONCERNING A COMPANY CRUCET WAS INTERESTED IN FORMING TO PROVIDE MEDICAL MALPRACTICE INSURANCE FOR DOCTORS AT REDUCED *617 PREMIUMS AND CRUCET INTENDED TO PROCEED UNDER THE RECENTLY PASSED CONGRESSIONAL ACT, WHICH PERMITTED RISK RETENTION GROUPS TO WRITE THAT SORT OF COVERAGE. ACCORDING TO BUCHALTER, CRUCET ATTEMPTED TO BUY AN INSURANCE COMPANY IN FLORIDA, HE WAS UNSUCCESSFUL IN DOING THAT AND HE TRIED SOME OTHER ARRANGEMENTS WHICH DIDN'T PAN OUT. SO HE FINALLY CAME UP WITH THE IDEA OF FORMING PHYSICIANS NATIONAL RISK RETENTION GROUP, I BELIEVE, THE FIRST ONE HE FORMED.
ACCORDING TO MR. BUCHALTER, HE WAS OFFEREDHE THOUGHT HE WAS OFFERED A PARTNERSHIP BY MR. CRUCET IN THIS VENTURE AND CRUCET WAS GOING TO PUT HIM IN CHARGE OF MARKETING, AS I RECALL. TO GIVE SOME INSIGHT TO MR. CRUCET'S CONCEPT CONCERNING THIS PROJECT WHICH HE HAD CONCEIVED AND WHICH HE HAD PROPOSED TO PUT INTO EFFECT, I RECALL VERY VIVIDLY MR. BUCHALTER'S TESTIMONY THAT HE UNDERSTOOD THAT CRUCET WAS OFFERING HIM A PARTNERSHIP DEAL RIGHT DOWN THE LINE, AN EQUAL PORTION OF THIS PROJECT. AFTER THE PROJECT HAD GONE ALONG FOR A WHILE APPARENTLY HE MENTIONED THIS TO CRUCET AND CRUCET'S RESPONSE WAS, I CAN'T QUOTE HIM DIRECTLY BUT I THOUGHT IT WAS RATHER HUMOROUS AT THE TIME, CRUCET'S RESPONSE WAS TO THE EFFECT THAT IF GOD HAD WANTED A PARTNERSHIP HE WOULD HAVE HAD ONE HIMSELF AND I GATHER THAT BUCHALTER INTERPRETED THAT TO MEAN THAT THERE WOULD BE NO PARTNERSHIP AND THAT CRUCET WAS GOING TO BE THE TOP DOG, HE WAS GOING TO RUN THE SHOW, HE DIDN'T WANT A PARTNER, HE DIDN'T WANT ANYBODY ON AN EQUAL LEVEL WITH HIMSELF, AND THAT GIVES ME SOME INSIGHT INTO WHAT CRUCET HAD IN MIND.
THEN THE NEXT STEP THAT CRUCET DID, AT THAT TIME HE WAS DATING JASMIN MARCEL AND ACCORDING TOI THINK IT WAS EITHER THE TESTIMONY OF BUCHALTER OR ALTENBACH, I'M NOT SURE WHICH, IS THAT IT WAS CRUCET'S IDEA TO ENLIST MS. MARCEL IN THIS PROJECT, AND THE PROJECT OF THIS ECS CORPORATION, TO ACT AS A MANAGEMENT CONCERN FOR CRUCET'S ENTERPRISE WAS CONCEIVED STRICTLY BY CRUCET AND NOT BY MS. MARCEL AND THAT CRUCET SET THIS THING UP, THIS COMPANY. THEN THE COMPANY, ECS, WASORIGINALLY, I THINK, CRUCET WAS A MEMBER OF THE BOARD OF DIRECTORS FOR SOME YEAR OR TWO. I THINK ECS WAS CHARTERED, I BELIEVE, SOME TIME IN '86 OR '87 AND CRUCET REMAINED ON THE BOARD UNTIL, I THINK, EITHER THE END OF THE '86 OR '87, AT WHICH TIME ACCORDING TO MS. CARPENTER HE WAS SQUEEZED OUT.
THERE'S ONE THING WHICH THE COURT FEELS IS SIGNIFICANT, THE FAILURE TO CALL MS. MARCEL. SHE KNOWS ALL ABOUT THE ARRANGEMENT THAT SHE HAD WITH CRUCET, SHE COULD EXPLAIN THIS TO THE COURT BETTER THAN ANYBODY ELSE BECAUSE SHE WAS THE ONLY ONE WHO DEALT WITH CRUCET IN SETTING UP THIS COMPANY. SHE KNEW WHAT CRUCET'S INTENTIONS WERE. BUT YET SHE WASN'T CALLED TO TESTIFY AND THE COURT CONSIDERS THAT TO BE VERY SIGNIFICANT.
ACCORDING TO THE PLAN THAT CRUCET HAD IN MIND, AS WELL AS THE COURT UNDERSTANDS THE TESTIMONY, AGAIN, ACCORDING TO MR. BUCHALTER, CRUCET'S EMPHASIS WAS ON SALES, ALL HE WAS INTERESTED IN WAS INCOME *618 AND TO ACCOMPLISH THAT PURPOSE CRUCET STARTED OUT WITHYOU KNOW, THIS WAS A MEDICAL MALPRACTICE INSURANCE, CRUCET STARTED OUT WITH A GROUP OF DOCTORS, ONE OF WHOM HAD HAD SOME LIMITED EXPERIENCE AS AN UNDERWRITER, BUT HE HAD NO INDEPENDENT UNDERWRITING STAFF OR CONCERN, THEY WERE TO WRITE THE INSURANCE COVERAGE THEMSELVES. THAT WENT ON FOR A WHILE UNTIL ECS CAME INTO THE PICTURE AND THEN, WHETHER IT WAS CRUCET'S IDEA OR MS. CARPENTER'S IDEA, THE IDEA OF HAVING A MARKETING FACILITY WAS SET UP AND I THINK THE FIRST ONE THAT WAS CREATED WAS BALLANTYNE, IF I REMEMBER CORRECTLY, THEY WERE GOING TO HANDLE SALES. PRIOR TO THAT TIME, I THINK MR. BUCHALTER SAID, THEY HAD SOME AGENTS OUT IN THE FIELD OR THE DOCTORS THEMSELVES WERE HANDLING SOLICITATION, THE DOCTORS ON THE BOARD OF DIRECTORS OF PHYSICIANS NATIONAL WERE SOLICITING BUSINESS FROM DOCTORS ON A ONE-ON-ONE BASIS AND THEN LATER ON THEY HIRED SOME AGENTS, WHETHER IT WAS THROUGH BALLANTYNE OR WHAT, AND THEY HAD THEM IN THE FIELD CONTACTING DOCTORS, AND THEN THEY WANTED TO PUT THEIR MARKETING EFFORTS ON A MORE SOPHISTICATED BASIS SO THEY FORMED BALLANTYNE, THE FIRST MARKETING GROUP. LATER ON I THINK THERE WAS ANOTHER COMPANY THAT WAS FORMED. THE FUNCTION OF ECS, ACCORDING TO THEIR CONTRACT, WAS TO PROVIDE MANAGEMENT SERVICES FOR PHYSICIANS NATIONAL AND WHATEVER OTHER CORPORATIONS WERE INVOLVED WITH PHYSICIANS NATIONAL. AT THE TIME THAT ECS WAS FORMED, AS THE COURT RECALLS IT, MS. CARPENTER HAD BEEN A CPA, SHE WORKED, I BELIEVED, FOR SOME BANK OR FOR THE FEDERAL GOVERNMENT AS AN ACCOUNTANT. SHE HAD HAD EXPERIENCE WITH HANDLING ACCOUNTING SERVICES FOR SMALL BUSINESS CORPORATIONS WITH CAPITAL OF FIVE MILLION OR LESS, OR SOME SUCH FIGURE AS THAT, BUT SHE HAD HAD NO PRIOR EXPERIENCE IN MARKETING. ANYWAY, THIS COMPANY WAS SET UP FOR THE PURPOSE OF PROVIDING MANAGEMENT SERVICES FOR ALL OF CRUCET'S CORPORATIONS.
WHAT HAPPENED AFTER ECS WAS HIRED, THEY WERE HIRED, AS I UNDERSTAND IT, INITIALLY FOR A SUM OF 8%, I THINK IT WAS, OF THE PREMIUMS THAT WOULD BE WRITTEN BY THE INSURANCE COMPANY AND SOME YEAR OR SO LATER THEY FOUND OUT THAT IT WAS INSUFFICIENT FOR THEIR PURPOSES SO I THINK THEIR COMMISSION WAS RAISED TO 10 AND ½% AND THAT WAS FOR THE OPERATION OF ECS AND REPAYMENT FOR ECS'S SERVICES FOR MANAGING ALL OF THESE COMPANIES. WHEN ECS CAME ON BOARD THEY SET UP OFFICES AT THE HEADQUARTERS OF PHYSICIANS NATIONAL AT MARIETTA, GEORGIA, WHEREVER IT WAS, THEY WERE ALL IN ONE BUILDING, THEY HAD A COMMON COMPUTER AND ECS MAINTAINED, THROUGH THAT COMPUTER, SEPARATE LEDGERS FOR EACH ONE OF THE COMPANIES INVOLVED. THERE'S NO QUESTION OF CO-MINGLING OF LEDGERS AND RECORDS IN THAT RESPECT. EACH COMPANY HAD ITS OWN SET OF RECORDS WHICH WERE KEPT BY MS. CARPENTER AND HER CREW. AS THE COMPANY GREW THEY HAD TO PUT ON MORE EMPLOYEES.
THE STATUS OF ECS AT THE TIME THAT IT WAS INCORPORATED WAS THAT IT HAD PRACTICALLY NO CASH ON HAND, IT HAD, WHAT, *619 $500.00 TO MEET THE MINIMUM CAPITALIZATION REQUIREMENT REQUIRED IN GEORGIA AND THEY HAD SOME $22,000.00 IN INVENTORY CONSISTING OF OFFICE FURNITURE AND EQUIPMENT, HAD ABSOLUTELY NO CASH TO OPERATE ON. AT THE END OF THE FIRST YEAR OF THE OPERATION ECS OWED THEIR EMPLOYEES THE SUM OF $400,000.00, WHICH THEY HAD TO BORROW IN ORDER TO CONTINUE IN BUSINESS AND CONTINUE FURNISHING THE SERVICES WHICH THEY HAD CONTRACTED TO PERFORM.
THE OPERATION OF THE COMPANY, LEAVES NO DOUBT IN THIS COURT'S MIND, THAT CRUCET CONTROLLED THIS THING ABSOLUTELY AND BEYOND ANY SHADOW OF A DOUBT, BUCHALTER TESTIFIED TO THAT EFFECT, MS. ELLERMEYER TESTIFIED TO THAT EFFECT, OTHER PEOPLE TESTIFIED TO THAT EFFECT AND I THINK THE PROOF OF IT IS JUST SIMPLY IN THE FACT THAT BEFORE THE COMPANIES PROVIDED A MARKETING SYSTEM CRUCET AND THE TWO DOCTORS THAT FORMED THE BOARD OF DIRECTORS OF PHYSICIANS CONTROLLED AND GOVERNED THE UNDERWRITING BUSINESS OF THE COMPANY. THERE'S TESTIMONY TO THE EFFECT THAT EVEN AFTER MRS. CARPENTER CAME IN SHE TRIED TO GET CRUCET TO CHANGE HIS POLICY OF OVERRIDING THE UNDERWRITERS THAT THEY HAD ULTIMATELY HIRED AND THAT CRUCET AND DOCTOR, WHATEVER HIS NAME WAS, I'VE FORGOTTEN, THEY WOULD INSURE PEOPLE THAT THE UNDERWRITERS HAD REJECTED. IN ONE INSTANCE THE COURT RECALLS THEY INSURED A DOCTOR AGAINST A SUIT THAT HAD ALREADY BEEN FILED, THEY INSURED HIM AGAINST A CLAIM WHICH HAD OCCURRED PRIOR TO THE TIME THEY ISSUED THE INSURANCE AND KNOWINGLY SO AND THAT THEY HAD A POLICY OF OVERRIDING THE UNDERWRITERS ON THE BASIS OF WHETHER A DOCTOR HAD HAD PREVIOUS MALPRACTICE CASES OR WHETHER HE HAD HAD CRIMINAL CONVICTIONS AND THE COURT IS CONVINCED THAT THIS WAS DONE MERELY TO GET PREMIUMS. ACCORDING TO BUCHALTER CRUCET SAID THE EMPHASIS WAS ON SALES, THAT'S WHAT BROUGHT MONEY INTO THE COMPANY AND CRUCET DID WHATEVER HE THOUGHT WAS NECESSARY OR EXPEDIENT TO BRING MONEY INTO THE COMPANY REGARDLESS OF WHETHER IT WAS A PRUDENT INVESTMENT OR WHAT.
NOW, ON THE QUESTION OF MR. CRUCET, CRUCET WAS A MEMBER OF THE BOARD OF ECS IN ITS INCEPTION, IT DIDN'T LAST VERY LONG, MS. CARPENTER SAYS HE WAS KICKED OUT, PERHAPS HE WAS. I HAVE SOME QUESTION IN MY MIND AS TO WHETHER CRUCET EVER KNEW THAT THAT ACTION HAD BEEN TAKEN, MAYBE HE WAS INFORMED OF IT, MAYBE HE WASN'T, SHE DIDN'T TESTIFY TO THAT EFFECT. BUT I HAVE SOME PROBLEM WITH ACCEPTING THE FACT OF WHETHER OR NOT CRUCET WAS ADVISED THAT THAT ACTION HAD TAKEN PLACE.
* * * * * *
I THINK THAT THE COURT HAD TO TAKE THE TOTALITY OF THE EVIDENCE AND DECIDE WHETHER OR NOT A SINGLE BUSINESS ENTERPRISE DID IN FACT EXIST. THE STATE HAS SHOWN EVIDENCE OF CRUCET, WHETHER IT WAS BEFORE OR AFTER HE WAS KICKED OUT, SENDING MONEY DOWN TO SENDING A NOTE DOWN TO ECS FOR SO MUCH MONEY. ONE OF THE EMPLOYEES TESTIFIED IT WAS CRUCET WHO WOULD SEND DOWN A REQUEST FOR A CHECK FOR SO MUCH, IT WAS PAID, THE *620 ONLY QUESTION WAS WHETHER TO CONSIDERED [SIC] IT AS A LOAN OR SALARY, BECAUSE OF CRUCET'S CONCERN OVER TAX RESPONSIBILITIES AS A RESULT OF THIS PAYMENT. THERE ARE OTHER EXAMPLES OF CRUCET'S ISSUING DIRECTIVES TO ALL OF THE ELEMENTS OF HIS EMPIRE, AS THIS COURT WOULD CHOOSE TO EXPRESS IT, WOULD BE THAT, WELL, THIS DIDN'T HAPPEN OR IGNORED IT. BUT I HAVE TO MAKE A CREDIBILITY DECISION AND I'LL HAVE TO SAY THIS; THAT I HAVE SOME PROBLEM WITH CREDIBILITY IN THAT REGARD, CONSIDERING ALL OF THE OTHER EVIDENCE CONCERNING CRUCET'S CONTROL, AND THIS COURT HAS NO PROBLEM WHATSOEVER IN SAYING CRUCET RULED THIS EMPIRE FROM THE TOP AND HE WAS THE MAN THAT SET THE RULES AND REGULATIONS AND PROBABLY ONE REASON WHY HE TERMINATED HIS CONTRACT WITH ECS IS THAT MAYBE HE JUST GOT TIRED OF THEM BUGGING HIM, AS THE SAYING GOES, I DON'T KNOW, BUT HE HAD HIS OWN REASONS. BASED UPON WHAT I HAVE HEARD HERE I'M INCLINED TO THINK THAT WAS THE REASON WHY CRUCETAND I THINK THAT'S NOT AN UNREASONABLE DEDUCTION FROM THE TESTIMONY THAT I'VE HEARD.
THE OTHER QUESTION CONCERNING ANOTHER FACTOR WHICH IS INVOLVED IN THE SINGLE BUSINESS ENTERPRISE IS THE ABILITY OF THE COMPANIES TO SURVIVEIN THIS CASE THE TESTIMONY IS AS CLEAR AS IT CAN BE THAT ALL THESE THREE COMPANIES THAT ARE INVOLVED COLLAPSED AND THEY'VE GONE OUT OF BUSINESS. THE DEFENSE HAS ATTEMPTED TO MAKE THE POINT THAT THEY WERE DOWNSIZED AFTER CRUCET SETTLED HIS RELATIONSHIP WITH THEM, CANCELED HIS CONTRACT, BUT THE TRUTH OF THE MATTER IS ALL OF THEM HAVE JUST COLLAPSED, THEY MAY STILL EXIST ON PAPER BUT NONE OF THEM HAVE GOTTEN ANY SIGNIFICANT BUSINESS, NONE OF THEM APPARENTLY HAVE ANY ASSETS. SO I WOULD THINK THAT'S PRETTY GOOD EVIDENCE OF THEIR FAILURE TO REALLY SURVIVE AS A VIABLE BUSINESS INTEREST AFTER THEY TERMINATED THEIR RELATIONSHIP WITH PHYSICIANS.
I COULD GO ON AND ON, GOING INTO A LOT OF DETAIL, BUT I THINK THAT THE STATE HAS BORNE ITS BURDEN AND I THINK I'LL SAY ONE OTHER THING THAT HAS CONVINCED ME; I FIND IT REAL STRANGE THAT MS. MARCEL WAS NOT CALLED AS A WITNESS IN THIS CASE AND I THINK THE LAW PRESUMES THAT IF YOU HAVE AN INTERESTED PARTY WHO IS A PARTY TO A TRANSACTION, WHO HAS A VITAL INTEREST IN ITS OUTCOME AND WHO FAILS TO APPEAR, THAT THE COURT IS ENTITLED TO PRESUME THAT HIS OR HER TESTIMONY WOULD BE UNFAVORABLE TO HIS OR HER SIDE AND THAT'S ANOTHER REASON WHICH TELLS ME TO REACH THE CONCLUSION WHICH I HAVE.
* * * * * *
THERE WAS ONLY ONE ASPECT OF THIS CASE THAT REALLY GAVE ME A PROBLEM, AND THAT WAS THE FACT THAT ECS'S CONTRACT PERMITTED THEM TO ENGAGE IN OUTSIDE ENTERPRISES IF THEY SO DESIRED. THAT CAUSED ME TO THINK MAYBE THEY WERE A SEPARATE BUSINESS, BUT THAT WAS OVERCOME IN MY MIND BY THE FACT THAT WHAT LITTLE EXTERIOR WORK THEY ATTEMPTED TO DO WAS ABSOLUTELY FRUITLESS AND THAT THEY NEVER DID PRODUCE ANY INCOME FROM ANY SOURCE AND THAT AFTER THE RELATIONSHIP WITH PHYSICIANS WAS SEVERED THEY DIDN'T GET ENOUGH *621 BUSINESS, OUTSIDE BUSINESS, TO STAY IN BUSINESS. SO THAT IS THE THING THAT REMOVED THAT FACTOR FROM MY MIND. THAT WAS THE THING THAT GAVE ME THE MOST CONCERN ABOUT THIS CASE. AS I SAY, I COULD GO ON AND ON, I THINK IN ORAL ARGUMENT COUNSEL HAS SHOWN EVIDENCE OF CRUCET'S CONTROL.... [THERE ARE] OTHER INSTANCES... WHERE THE CONDUCT OF THESE PEOPLETHEY JUST DID BUSINESS BACK AND FORTH AS THOUGH THEY WERE ONE ENTITY, THEY DIDN'T WORRY ABOUT IT. A LOT OF THINGS WHICH WAS [SIC] DONE BY BOTH SIDES WERE NOT DOCUMENTED BY BOARD RESOLUTIONS OR BY EVIDENCE OF ANY KIND OF CORPORATE AUTHORITY TO MAKE NEW LOANS OR EITHER LEND THE MONEY OR TO INCUR THE LOAN, IT WAS JUST DONE, UP AND SAY, WELL, I NEED SO MUCH MONEY, YOU SENT IT TO ME AND LATER ON WE'LL PUT IT ON THE BOOKS. I MEAN THAT DOESN'T SEEM LIKE AN INDEPENDENTONE OTHER THING THAT BUCHALTER STATED THAT STAYED IN MY MIND. IN BUCHALTER'S TESTIMONY HE STATED AT THESE MEETINGS THAT THEY HAD, SOME OF WHICH MS. MARCEL ATTENDED, OF PHYSICIANS THAT IT WAS ALWAYS DONE CRUCET'S WAY AND THAT IF CRUCET SAID THIS IS THE WAY IT'S GOING TO BE, THAT'S THE WAY IT'S GOING TO BE AND I THINK THAT'S QUOTING MR. BUCHALTER VERBATIM, AS I RECALL HIS TESTIMONY.
IN VIEW OF THE FACTS AND MY ANALYSIS OF THE TESTIMONY THAT I'VE HEARD I HAVE NO HESITANCY IN DECLARING THAT THESE CORPORATIONS ARE A SINGLE BUSINESS ENTITY WITH PHYSICIANS.
After a thorough and complete review of the considerable testimony in this matter, we find that the facts and reasons stated above are amply supported by the record. From our review of the record, we are unable to conclude that these findings are manifestly erroneous or clearly wrong. This assignment is without merit.

CONSTITUTIONAL ISSUE
Lastly, we consider the assertion by ECS and SEL that the trial court, in the person of Judge Paul B. Landry, lacked lawful jurisdiction to hear the case. Appellants argue that courts of special and limited jurisdiction can only be created by the legislature. They maintain if the combined effect of an appointment by the State Supreme Court, and the utilization of that appointment by the District Court creates a court of special and limited jurisdiction, then those activities are unconstitutional, and the court which is created lacks legal authority to act.
By order of the Louisiana Supreme Court, dated June 16, 1993:
Retired Judge Paul B. Landry, Jr. be and he is hereby assigned as judge pro tempore of the Nineteenth Judicial District Court, Parish of East Baton Rouge, effective for the dates of July 1, 1993 through December 31, 1993, in order to preside over those cases arising out of claims against Champion Insurance Company and Fidelity Fire and Casualty Insurance Company; and, to preside over other matters and litigation relating to various insurance companies placed in liquidation, conservation or other regulatory status, the liquidation of Champion Insurance Company and the conservation of its affiliate, Capital Insurance Company, being excluded; subject to the completion of any unfinished business.
This order shall not deprive the judges of the Nineteenth Judicial District Court, Parish of East Baton Rouge, of their offices as judges of the Nineteenth Judicial District Court, Parish of East Baton Rouge, or of any other courts to which they may have been assigned by previous order of this Court, nor shall it deprive Retired Judge Paul B. Landry, Jr. of his office as judge of any other court to which he may have been assigned by previous order of this Court.
*622 It is without question that the Louisiana Supreme Court has authority to assign Judge Paul B. Landry judge pro tempore of the Nineteenth Judicial District Court. The Louisiana Constitution art. V, § 5(A) states, in part:
The supreme court has general supervisory jurisdiction over all other courts. It may establish procedural and administrative rules not in conflict with law and may assign a sitting or retired judge to any court.
However, appellants argue the effect of the referral of all insurance company matters to the "insurance judge" strips the other judges of the Nineteenth Judicial District of jurisdiction over insurance matters and creates a specialized division within the Nineteenth Judicial District. The error of this argument lies in the very language of the appointment order from the Supreme Court. The order does not deprive any sitting judge of the Nineteenth Judicial District of his or her authority granted by Louisiana Constitution art. V, § 16 to hear all civil matters. Nor does the order create a "specialized" court wherein all insurance cases must be heard by Judge Landry.
In addition, the use of a system by the Nineteenth Judicial District to distribute civil matters which are before the court does not create a specialized court. As stated in Piper v. Olinde Hardware & Supply Company, Inc., 288 So.2d 626, 629 (La.1974), "each judicial district constitutes a single court, and the creation is [sic] different divisions does not operate to sever a single district court into multiple courts." This assignment is without merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to the appellants.
AFFIRMED.